NAACP, JEFFERSON COUNTY
BRANCH, et al., Plaintiffs,

v.

U.S. SECRETARY OF LABOR,
et al., Defendants, and

U.S. Sugar Corporation, et al.,
Defendants–Intervenors.

Civ. No. 82–2315(CRR).

United States District Court,
District of Columbia.

Sept. 22, 1994.

Edward J. Tuddenham of Richards, Wiseman & Durst, Austin, TX, Shelley Davis of Farmworker Justice Fund, Inc., Washington, DC, Robert Williams of Florida Rural Legal Services, Tallahassee, FL, for plaintiffs; William Stein of Hughes Hubbard & Reed, of counsel.

Michael J. Ryan, Asst. U.S. Atty., together with Eric H. Holder, Jr., U.S. Atty., and John D. Bates, Asst. U.S. Atty., for defendants; Thomas S. Williamson, Jr., Sol. of Labor, Charles Raymond, Associate Sol. for Employment and Training Legal Services, Harry Sheinfeld, Counsel for Litigation, Vincent C. Costantino, Asst. Counsel for Litigation, U.S. Dept. of Labor, Washington, DC, of counsel.

John M. Simpson, Robert A. Burgoyne, and Frederick Robinson of Fulbright & Jaworski, Washington, DC, for intervenors-defendants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

### INTRODUCTION

Throughout the history of this litigation, the Plaintiffs in the above-captioned case have challenged the actions of the Department of Labor (the "Department" or "DOL") in interpreting and enforcing its regulations in various agricultural sectors of the country. Unfortunately, the Department's commitment to ensuring that the statutory rights of U.S. farm workers are fully and fairly protected has often been questionable at best. It is perhaps thus not surprising that the most recent phase of this litigation seems to present yet another instance in which the Department has failed to properly fulfil its statutory and regulatory obligations to protect domestic farm workers, thereby leaving

them potentially vulnerable to exploitation by agricultural employers whom DOL has declined to properly regulate.

Primarily at issue during this stage of the case are the particular payment practices utilized in the Florida sugar cane industry. In 1986, the Plaintiffs initiated this phase of the litigation by challenging the Department's failure to apply its "piece rate" regulations to the "task rate" payment system then used by the Florida Sugar Cane Growers, two of whom later moved to intervene in this case (the "Intervenor–Defendants" or the "Growers").

At that time, the Court determined that factual disputes existed as to the method of payment in the sugar cane industry, as to whether DOL regulations were applicable to the task rate system, and as to whether any of the Department's regulations or this Court's Orders were violated. The Court therefore directed the Department to undertake an investigation of these matters. On November 12, 1993, the Department issued the "U.S. Department of Labor Final Report Regarding Methods of Payment in Sugar Cane" ("Final Report")—which is now before the Court for judicial review and is the subject of the instant dispute.

All three of the parties to this litigation have filed Motions for Summary Judgment in response to the issuance of DOL's Final Report. The Plaintiffs have challenged the conclusions reached by the Department as arbitrary, capricious, and contrary to law—while DOL and the Growers have both urged the Court to recognize the limited scope of judicial review and uphold the Department's determinations as set forth in the Final Report.

In connection with all three Motions, the Court has received voluminous papers from all parties to this case. Moreover, on March 23, 1994, the Court held an extensive Hearing to address the many arguments contained therein. Now, upon careful consideration of all of the relevant submissions, the oral arguments of counsel, the applicable law, the long history of this case, and the entire record herein, the Court has determined that, although the Plaintiffs' Motion for Summary Judgment may be granted in part, further proceedings will be necessary to resolve the remaining issues presented by this dispute.

More specifically, the Court finds that the conclusions contained within the Department's Final Report cannot withstand judicial review. To that extent, the Plaintiffs' Motion for Summary Judgment shall be granted. However, in rejecting the Department's resolution of the many issues posed by this case, the Court is still left with a number of unanswered factual questions which will require further proceedings to resolve. Most importantly, there remain substantial disputes as to whether there were any regulatory violations which would entitle the Plaintiffs to further relief, thereby rendering summary judgment on the remaining issues in this case inappropriate at this time.

It is, to say the least, unfortunate that the Court cannot accept the Department's conclusions as set forth in the Final Report. As noted at the outset, however, the Department's dedication to the protection of U.S. farm workers has been far from above reproach, and the Court will not merely "rubber stamp" the Final Report's determinations when they are not supportable as a matter of law. Accordingly, the Court finds that the Final Report cannot be upheld and that further proceedings will be required to resolve the remaining issues presented by this case.

## BACKGROUND

The history of this case is by now undoubtedly quite well-known to all of those involved with the many phases of this litigation. For this reason, the Court shall only briefly review the sequence of events leading up to the Department's issuance of the Final Report, which is now the subject of the instant cross-Motions for Summary Judgment.

This litigation originated in the summer of 1982. At issue was the Department of Labor's administration of the temporary foreign worker program, then known as the "H–2" program.[1] Under the program, farmers are

---

1. The term "H–2" refers to the subsection of the Immigration and Nationality Act addressing the

permitted to employ foreign workers on a temporary basis upon certification by the Department of Labor that U.S. workers are unavailable and that the use of foreign workers will not adversely affect the wages and working conditions of similarly employed U.S. farm workers.

In order to protect against such "adverse effect," the Department has issued a series of regulations designed to govern wages and working conditions. *See* 20 C.F.R. § 655. Prominent among these requirements is the existence of a special minimum hourly wage rate known as the "adverse effect wage rate" ("AEWR"). The operation of the AEWR is comparable to that of the more common "minimum wage" and needs no further explanation here.

However, in many sectors of the economy, agricultural workers are not paid by the hour—but rather are compensated under what is commonly known as a "piece rate" system. DOL thus promulgates additional "piece rate" regulations in order to protect against "adverse effect" in these industries. The relevant piece rate regulation under the H–2 program was 20 C.F.R. § 655.207(c) which provided that:

> in any year in which the applicable adverse effect rate is increased, employers shall adjust their piece rates upward to avoid requiring a worker to increase his or her productivity over the previous year in order to earn an amount equal to what the worker would earn if the worker were paid at the adverse effect wage rate.

20 C.F.R. § 655.207(c) (superseded).

Later, when the Immigration and Nationality Act was amended by the Immigration Reform and Control Act of 1986, 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a) and 1188, the piece rate rule at 20 C.F.R. § 655.207(c) was superseded by new regulations. The relevant regulation under the new H–2A program is 20 C.F.R. § 655.102(b)(9)(ii)(B)(1) and (2) which provides that:

If the employer who pays by the piece rate requires one or more minimum productivity standards of workers as a condition of job retention, (1) such standards shall be specified in the job offer and be no more than those required by the employer in 1977, unless the RA approves a higher minimum; or (2) if the employer first applied for H–2 agricultural or H–2A temporary alien agricultural labor certification after 1977, such standards shall be no more than those normally required (at the time of the first application) by other employers for the activity in the area of intended employment, unless the RA approves a higher minimum.

20 C.F.R. Section 655.102(b)(9)(ii)(B)(1) and (2).

The Plaintiffs' original challenge arose in response to the Department's interpretation of its H–2 piece rate regulations as applied to the payment practices of a number of West Virginia apple growers.[2] In 1983, the case was converted into a nationwide class action and two more years of administrative and judicial proceedings ensued. A final decision was ultimately rendered in August of 1985 which required that piece rates be adjusted in proportion to any increases in the AEWR. In addition, the Court further required that minimum, job-retention productivity standards not be raised above 1977 levels so as to prevent employers from improperly increasing productivity requirements in order to offset increases in piece rates required by the AEWR.

Thereafter, in 1986, the Plaintiffs filed a Motion for Further Relief, challenging the Department's failure to enforce its piece rate regulations in the sugar cane industry. In its defense, the Department contended that the "task rate" payment system utilized by sugar cane growers was not a "piece rate" and thus was not subject to the Department's piece rate regulations. More specifically, DOL argued that sugar cane workers were paid by the row (or number of feet cut in a

---

immigration status of temporary foreign agricultural workers. In 1987, the program was redesignated "H–2A" pursuant to enactment of the Immigration Reform and Control Act of 1986. *See* 8 U.S.C. Section 1101(a)(15)(H)(ii)(a).

**2.** In November of 1989 the Plaintiffs were granted leave to file a Second Supplemental Complaint, challenging the Department's interpretation of the newly promulgated regulation as well.

given row) and that the price varied from row to row as a result of different factors affecting the degree of difficulty in cutting conditions.·

On the basis of the limited record presented at that time, the Court determined that a factual dispute existed as to the method of payment in the sugar cane industry and as to whether the Department's regulations should be applied to these payment practices. The Court therefore directed the Department to investigate this matter in order to determine whether the method of payment in the sugar cane industry was properly subject to the Department's piece rate regulations and whether there were any violations of the Department's regulations or the Court's Orders in this case.

The Court thus ordered the Department to gather the data necessary to resolve this dispute, specifically directing DOL to:

> gather from all sugar cane growers who have applied for or been awarded temporary labor certification for the 1986–1987 harvest season such information as is necessary to determine the growers' method of payment to their workers, how the growers calculate their productivity and piece or task rates, whether such rates are subject to 20 C.F.R. 655.207(c), and if so, whether the piece rates offered and/or paid by those growers comply with the Court's orders and judgment in this case.

See Court's Order dated September 25, 1986.[3] In connection with the development of this factual record, the Court's September 25, 1986 Order also permitted the Plaintiffs to take appropriate discovery in accordance with the Federal Rules of Civil Procedure.

In response to the Court's Order, the Department of Labor then commenced its investigation of the sugar cane task rate system, issuing a Draft Report on October 13, 1987. The Intervenor–Defendants commented on the Draft Report, as requested by the Department, within thirty days of its publication.[4] The Plaintiffs, however, requested a delay and sought discovery against the sugar cane Growers. Finally, on July 2, 1992, the Plaintiffs submitted their response to the Draft Report.

Upon receipt of this information, the Department decided to retain an independent consultant. Dr. Robert Emerson was thus hired on September 29, 1992 to review the materials submitted. Throughout early 1993, further replies and rebuttals were submitted to the Department by both the Plaintiffs and the Growers. Dr. Emerson then submitted his Final Report to the Department in July of 1993, followed by submission of a Supplement in September of 1993. Finally, on November 12, 1993, the Department of Labor issued its Final Report Regarding Methods of Payment in Sugar Cane ("Final Report").

In issuing the Final Report, the Department essentially concluded that the task rate system was not subject to the piece rate regulations and that no violations of DOL regulations had been documented:

> DOL concludes that it acted reasonably in approving the pay systems used for sugar cane workers during the years relevant to this dispute, that there was no disguised piece rate paid to workers, and that the growers did not violate either 20 C.F.R. § 655.207(c) or 20 C.F.R. § 655.102(b)(9).

See Final Report at 34.

Upon receipt of the Final Report, the Plaintiffs moved to re-open this case on November 22, 1993, seeking judicial review of the Secretary's determinations as set forth therein. In response, the Federal Defendants and the Intervenor–Defendants filed objections to the Motion to Reopen. Both the Department and the Growers argued

---

**3.** Pursuant to that same Order, the Court also required the Department to notify those sugar cane growers receiving temporary labor certification for that and subsequent harvesting seasons that they might be required to make additional wage payments at some point in the future should it be determined that the growers were using a piece rate system that failed to comply with the requirements of 20 C.F.R. Section 655.207(c). During the March 23, 1994 Hearing, counsel for the Defendants assured the Court that the Department had fully complied with this notification procedure.

**4.** The Intervenor–Defendants, the United States Sugar Corporation ("USSC") and the Sugar Cane Growers Cooperative ("SCGC") of Florida were granted leave to intervene in February of 1990.

that the case should be dismissed as moot on jurisdictional grounds, albeit for different reasons.[5] The Court therefore permitted briefing on this issue and heard oral argument on February 3, 1994.

Thereafter, on February 22, 1994 the Court issued a Memorandum Opinion and Order denying both Motions to Dismiss. The Court then confirmed the briefing schedule for the filing of Summary Judgment Motions and established a Hearing date of March 23, 1994.

In connection with the parties' respective Motions for Summary Judgment, the Court has received voluminous papers from all concerned, including an *Amici Curiae* Memorandum filed by Representatives William D. Ford, George Miller, and Howard Berman, expressing concern over what they perceive to be "DOL's peculiar position effectively exempting the sugar cane task system from enforcement under the piece rate regulations." [6] In addition, as indicated above, the Court also entertained lengthy oral argument from counsel for all three parties at the March 23, 1994 Hearing. It is thus upon very careful consideration of all the relevant submissions, the oral arguments of counsel, the applicable law, and the entire record in this case, that the Court has reached the determinations set forth below.

## *DISCUSSION*

In their Motion for Summary Judgment, the Plaintiffs have raised three primary challenges to the Department's conclusions as set forth in the Final Report:

(1) The Plaintiffs strongly contest the Department's determination that the task rate system is not subject to the piece rate regulations.

(2) The Plaintiffs further quarrel with the Department's rejection of the proposition that there was an 8 ton/day minimum productivity standard in the sugar cane industry.

(3) The Plaintiffs dispute the Department's determination that there were no regulatory violations during the relevant harvest seasons.

Notwithstanding the deferential standard of review required of the Court in reviewing the Department's Final Report, the Court finds substantial merit to all three of the Plaintiffs' claims and must therefore conclude that DOL's determinations cannot be upheld. However, in rejecting the Department's conclusions as set forth in the Final Report, the Court has been careful not to improperly substitute its judgment for that of the agency in matters as to which significant factual discrepancies still exist. For this reason, the Court believes that further proceedings will be required to resolve the questions left unanswered as a result of the Court's rejection of the Final Report.

## *STANDARD of REVIEW*

■ In reviewing the Final Report, the Court is mindful of the appropriate standard of review, which is limited to whether the agency action challenged was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As the Defendants point out:

5. The Department relied heavily on the fact that at the present time no sugar cane growers utilizing the H–2A program use a task rate system of payment. *See* Joint Statement of Material Facts which are not in Dispute at 5. The Growers primarily sought dismissal arguing that no claim had been directly asserted against either of the Intervenor–Defendants. Both issues are of course addressed more fully in the Court's February 22, 1994 Memorandum Opinion and thus need not be elaborated on here. However, it is important to note at this time that in November of 1992, the Plaintiffs sought leave to file a Second Supplemental Amended Complaint, in part to add direct claims for restitution against the Intervenor–Defendants. At that time, the Court denied the Plaintiffs' Motion, finding it "unneces-

sary to the relief already claimed herein by virtue of the pleadings extant." *See* Court's Order of November 30, 1992. This issue is discussed more fully below.

6. The *Amici* question what they term "DOL's surprising reversal of position" and further urge the Court to continue its "vigilance" in ensuring that "the statutory rights of farm workers are fully enforced by federal agencies under pressure from farm growers to accommodate their own economic interests." *See* Memorandum of Representatives William D. Ford, George Miller, and Howard Berman as Amici Curiae in support of Plaintiffs' Motion for Summary Judgment.

[T]he Court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency.

See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). As such, the Court has accorded substantial deference to the determinations of the Secretary as set forth in the Final Report. Nevertheless, the Court finds that there appear to be clear errors of judgment (and failure to consider all relevant factors) with respect to each of the three issues challenged by the Plaintiffs, thereby requiring invalidation of the Final Report.

I. *The Court finds that the Department's determination that the sugar cane task rate system is not subject to DOL's piece rate regulations constitutes an interpretation that must be rejected as arbitrary, capricious, and contrary to law.*

In issuing the Final Report, the Secretary has concluded that the sugar cane task rate system is not a piece rate, and is therefore not subject to the Department's piece rate regulations. Essentially, DOL has taken the position that the method of payment in the sugar cane industry is an incentive-based system pursuant to which workers are paid on the basis of how many feet are cut per row. However, since variability in cutting conditions affects the price per row, the Department concludes that there is no predetermined piece rate (nor a standard unit of production)—thereby rendering this payment system incapable of the sort of proportional adjustment mandated by DOL's regulations or this Court's Orders.

The Plaintiffs, however, vigorously contest the Department's interpretation which seemingly exempts all but "simple" piece rates from the protections afforded by these regulations. In other words, when confronted with "complex" piece rates, such as the payment system utilized by the sugar cane in-dustry, the Department seems content to rely on the alleged difficulty of applying the regulations as a reasoned basis for concluding that the payment system is not even subject to the piece rate regulations.

The Court has carefully considered all of these arguments, and must conclude that the Department's determination that the task rate system is not a regulable piece rate is unlawful. As demonstrated below, the Department's conclusion is contrary to both the plain meaning and the purpose of the regulations, and is inconsistent with the agency's prior position on this issue. Most importantly, the Court finds that there is no reasoned basis for the Department's conclusion and it can thus not be upheld as a matter of law.

A. **The plain meaning of the term "piece rate" does not support the Department's Interpretation of its regulations.**

In urging the Court to reject the conclusions set forth in DOL's Final Report, the Plaintiffs first contend that the Department's interpretation of the term "piece rate" is contrary to the "plain language" of the regulations. Although the Department strenuously objects to this argument, the Court finds ample evidence for the Plaintiffs' contention that the plain meaning of the term "piece rate" is inconsistent with the Department's current interpretation.

As the Plaintiffs correctly point out, both §§ 655.207(c) and 655.102(b)(9) refer to "piece rates" generally; neither indicates any intent to limit or qualify the term in any way. The Plaintiffs thus urge the Court to find that the plain language of the regulations "compels the conclusion" that the term "piece rate" was meant to encompass a vast array of production-based wage systems, including the task system at issue in this case. See Plaintiffs' Motion for Summary Judgment at 19.

The broad definition of piecework set forth in the Dictionary of Economics indeed supports the Plaintiffs' argument. As defined therein, a "piece rate" is merely "a wage schedule which computes wages by assigning a certain sum for each article produced or

each operation completed." As there is no requirement that the unit of production or pay be the same on a daily basis, the Court must agree with the Plaintiffs that the plain language of the regulations does not support the restrictive interpretation of the term adopted by the Department in compiling its Final Report.

■ Even more significantly, *all* of the wage specialists who participated in this case—including DOL's own consultant Dr. Robert Emerson—agreed that the term "piece rate" as it is commonly used encompasses complex piece rates such as the task rate system utilized by the Florida sugar cane growers. Given this broad consensus, the Court has no doubt that the "plain language" of the regulations does not support the Department's conclusion that the task rate system is not properly subject to the Department's piece rate regulations. There is no evidence to indicate an intent to limit the definition of "piece rate" to a simple wage or payment schedule, and there is uncontradicted evidence that the term "piece rate," as it is generally used, encompasses both simple and highly complex payment systems.

Moreover, the Defendants' efforts to convince the Court otherwise are hardly persuasive. In attempting to rebut the Plaintiffs' contention with respect to this issue, the Department misreads the Plaintiffs' argument, and overstates the Court's ruling in issuing its September 25, 1986 Order. More specifically, the Department's primary opposition to the Plaintiffs' claim seems to rest on the mistaken assumption that the Court's Order of September 25, 1986 "implicitly accepted" the Department's contention that variable changes in the task rate preclude the sort of mechanical adjustment mandated by the piece rate regulations. In reality, however, the Court merely confirmed that a factual dispute existed as to this issue.

Thus, while it is true that the Court concluded that a factual dispute existed as to the method of payment in the sugar cane industry and as to whether the regulations in question were appropriately applied to the task rate system, the Court did not in any way "implicitly accept" the view that complex task rates were not properly subject to piece rate regulations, as the Department now seeks to contend. *See* Defendant's Opposition at 2. Nor did the Court "essentially reject" the Plaintiffs' plain meaning analysis in directing the Department to investigate this issue and compile the Final Report. *Id.*

Rather, the Court found only that the development of a fuller factual record would be required in order to resolve these issues. That record is now before the Court, and nothing in the Court's decision to direct production of that Report should now be read as an implicit acceptance of the Department's instant conclusions. Nor, of course, should the Plaintiffs be precluded from basing their argument, at least in part, on a plain meaning analysis now that the record is complete. This is especially true in view of the fact that all of the specialists commenting in this case concurred in the belief that the term "piece rate" generally encompasses complex payment systems, thereby lending further factual support to the Plaintiffs' plain meaning analysis.

**B. The Department's conclusion that the task rate system is not subject to its piece rate regulations is also inconsistent with the purposes of the regulations.**

■ The Court further finds that the conclusions set forth in the Final Report are inconsistent with the purposes of the piece rate regulations. The Plaintiffs persuasively argue that the regulations in question must be construed broadly because they were designed to protect U.S. workers against the adverse effects of foreign competition. For this reason, the Department's decision to exempt complex piece rates from these regulatory protections is problematic—as such a narrow definition of "piece rate" would fail to encompass the wide variety of agricultural pay practices utilized throughout the country. The Court must thus agree with the Plaintiffs that it would indeed be arbitrary to exempt all but simple piece rates from the protections afforded by the piece rate regulations.

Moreover, the specific purposes underlying the development of the proportional increase piece rate regulations are equally inconsistent with the conclusions reached by the Department in the Final Report. The regulations were intended to prevent increases in minimum productivity requirements that effectively undermined increases in the AEWR. As the Plaintiffs correctly point out, workers employed in industries utilizing complex piece rate systems are certainly no less vulnerable to the sort of exploitation these regulations were designed to prevent; indeed, they are perhaps more susceptible to wage depression and productivity increases as they are likely to have greater difficulty understanding the basis upon which they are ostensibly being paid, thereby rendering them even more in need of the protections afforded by the proportional increase piece rate regulations.

Once again, the Court finds the Department's response to these claims wholly unsatisfactory. It is true that the task of defining adverse effect is within DOL's discretion and that the Department is entrusted with the responsibility for balancing two competing interests: the need to protect jobs with the importance of ensuring farmers an adequate labor force. Nevertheless, the Court cannot merely "rubber stamp" DOL's determinations in this regard when confronted with the Department's illogical refusal to address the consequences of this position.

In particular, the Court is highly troubled by the Defendants' assertion that the primary "tool" or "safeguard" for protecting workers has been the AEWR and not the regulations at issue in this case. Although the AEWR undeniably plays a major role in combatting adverse effect, it is clear that the failure to control minimum productivity requirements may undermine any increases in the AEWR, thereby leaving workers potentially even more disadvantaged than they might be without any increase in the AEWR at all. As such, the Court cannot accept the Department's sole reliance on the AEWR as protection for these workers, and remains greatly concerned by what appears to be a stubborn resistance on the part of DOL to the importance of acknowledging and addressing the interdependent relationship between the AEWR and minimum productivity requirements for workers paid on a non-hourly basis.

**C. The Court further finds that DOL's current interpretation of its piece rate regulations is inconsistent with the agency's previous positions on this issue.**

The Plaintiffs further contend that, even if the Department's current interpretation were consistent with the language and purpose of the regulations, the conclusions set forth in the Final Report should still be rejected as an unexplained change in the Department's longstanding policy pursuant to which the task system was regulated as a piece rate. Indeed, the Plaintiffs contend that it was not until 1983 when this·Court issued its injunction in *NAACP II* that the Department took the position that the task rate system was not subject to the piece rate regulations.

In support of this contention, the Plaintiffs cite numerous examples from the 1960s and 1970s of instances in which the Department (and the Growers) referred to the sugar cane payment system as a "piece rate" and treated the industry accordingly. *See* Plaintiffs' Motion for Summary Judgment at 21–24. The Plaintiffs therefore contend that the Department's current position is nothing more than a convenient litigation posture; and the mere fact that it has been in existence for the past decade (since the inception of this litigation) does not entitle it to any greater deference.

Indeed, even the Defendants must concede that "information in the record indicates that the task rate system has been called a piece rate system," arguing only that the statements in question were "not directed to, nor instructive about, how task rates can be regulated" under the piece rate regulations. *See* Department's Opposition at 8. Under the circumstances, however, the Court does not find this distinction terribly persuasive. Moreover, to suggest, as the Defendants have, that the "Department was· *remiss* in not previously articulating its definition of a 'piece rate' as a simple piece rate" is an

understatement, to say the very least. *See* Defendants' Opposition at 8, n. 2 (emphasis added).

The Court must thus agree with the Plaintiffs that the Department's current interpretation is inconsistent with the agency's previous positions regarding this issue, and represents an unexplained change in DOL's longstanding policy.

**D. Although the Department has undoubtedly expended considerable time and effort in investigating this issue and preparing the Final Report, the Court cannot accept the conclusions set forth therein, as there is no reasoned basis for DOL's current interpretation of its piece rate regulations.**

■ Not surprisingly, both the Defendants and the Intervenor–Defendants repeatedly urge the Court to recognize that the Department engaged in a thorough and lengthy examination of these issues in compiling the Final Report—and that any objections the Plaintiffs now seek to raise as to factual matters have already been considered and rejected by the agency. As such, the Defendants and the Intervenor–Defendants argue that the Court should not overturn or otherwise interfere with the Department's determinations as set forth in the Final Report.

It is true that the Plaintiffs have not explicitly challenged the Defendants' contention that the departmental review process was adequate; and it is undisputed that the Department began their review over seven years ago, publishing a draft report in 1987 and soliciting comments from both parties at that time. However, the Court cannot simply accept the conclusions contained therein merely because the Department has procedurally complied with the Court's Order of September 25, 1986 to promptly and thoroughly undertake a comprehensive investigation of these issues. Although the Defendants may have conducted an extensive inquiry as to the issues pertinent to this matter, the Court finds that the Department's conclusions are not consistent with the regulations and cannot therefore be upheld.

**E. The Court must ultimately reject the Department's conclusion that the task rate system is not subject to the piece rate regulations because it appears to be based on nothing more than the perceived difficulty of implementation and enforcement—problems which the Department has neither adequately explained nor addressed in a reasonable way.**

■ With respect to the issue of whether the task rate system is subject to the piece rate regulations, the Court remains unpersuaded that DOL has a reasoned basis for adopting its current position. The Department maintains that the task rate system utilized by the sugarcane industry is *"incapable* of the type of mathematical adjustment required under Section 655.207(c)." *See* Department's Opposition at 10. More specifically, DOL contends that in order for the regulation to be applied it "required a discrete, identifiable rate, or series of rates, against which this mathematical adjustment could be applied." *Id.,* quoting the Final Report at n. 9. Arguing that "[n]o one piece rate was identified which could be adjusted in order to meet the criteria of the regulations," the Department urges the Court to accept the Final Report's finding that the task rate system is not, and cannot be, subject to the proportional increase piece rate regulations.

The Court, however, must agree with the Plaintiffs that the Department's arguments in this respect are without merit. To suggest, as the Defendants have done, that the "difficulty" of applying the piece rate regulations to the task rate system warrants the conclusion that the regulations were not *intended* to cover the sugar cane industry is hardly a persuasive argument. As the Plaintiffs aptly point out, "[t]he intended scope of a regulation when written cannot be measured by a perceived enforcement problem which arises years later." *See* Plaintiffs' Motion at 26.

Nor can the Court accept at face value the Defendants' contention that application of the piece rate regulations to the sugar cane task rate system would be an "impossibility."

The Plaintiffs have argued that several of the growers claim to have adjusted their wage rates in response to increases in the AEWR, thereby suggesting that such procedures are indeed possible. In addition, the Plaintiffs assert that either the "budgeted rate per ton" could be increased in proportion to annual increases in the adverse effect rate or the growers could be required to pay the AEWR per ton as alternative means of ensuring compliance with the piece rate regulations.

Without even addressing the merits of either such proposal, the Court is greatly concerned by the Department's sweeping assertions as to "impossibility" in view of the proposals set forth by the Plaintiffs. Even more troubling is the Defendants' recent contention in opposing the Plaintiffs' Motion, in which DOL seeks to rebut the Plaintiffs' claim that the task rate system is subject to these regulations by arguing that the Plaintiffs did not even "try to demonstrate a mechanism for adjustment ... nor how to determine what the actual rate is." *See* Defendants' Opposition at 11. In making this claim the Defendants do not even acknowledge, let alone rebut, the Plaintiffs' proposals in this regard.

Thus, although due deference to agency expertise requires that the Court refrain from substantively evaluating the Plaintiffs' suggestions at this time, the Department's overall conclusion (that the task rate is not a piece rate) cannot withstand judicial review in the face of such obvious failure to consider and respond to these proposals. At the very least, the Defendants' failure to address this matter in their submissions to the Court raises serious questions as to DOL's claim that the Final Report represents a reasoned analysis entitled to substantial judicial deference upon review.

**F. There is also no reasoned explanation for the Department's insistence that the piece rate regulations require wage adjustments to occur *within* each payroll period.**

■ Moreover, to the extent that the Department has commented on the Plaintiffs' alternative proposals, DOL's rejection seems premised upon the arbitrary notion that the primary purpose of the regulations is "pro-

tecting the wages of workers *in each payroll period.*" *See* Final Report at 21, n. 13. The Department offers no explanation for the imposition of what appears to the Court to be a highly arbitrary and unnecessary restriction which limits the applicability of the regulations without good reason.

While not entirely foreclosing the possibility that the Department may have some valid reason for imposing this requirement, the Court cannot accept the Department's current interpretation without any explanation for the agency's insistence that the regulations are inapplicable if not capable of implementation within a given payroll period. As the Plaintiffs point out, it is "arbitrary to suggest as does DOL's Final Report, that if wages can't be protected on a payroll period basis, DOL has no duty to protect them at all." *See* Plaintiffs' Motion at 28.

**G. The Department has also failed to adequately explain why the piece rate put forth by its own consultant is not properly regulable under the piece rate regulations.**

■ Significantly, even DOL's own consultant, Dr. Emerson, concluded that the task rate system was properly characterized as a "piece rate" with the relevant unit being the "row with given conditions." DOL arbitrarily dismisses this determination, however, with the assertion that such a rate cannot be determined in advance or applied uniformly.

Although application of the regulations to such a system would undoubtedly be more difficult than implementation of the regulations in a simpler payment system, the Department has offered no explanation for why a standard set of various combinations of row conditions could not be developed and applied throughout the industry to ensure compliance with DOL regulations. Thus, while the Court is not affirmatively asserting that this is the applicable piece rate, or that the Department should have accepted this as the piece rate, the Court cannot accept the Department's blanket dismissal of all such possibilities as reasoned analysis capable of withstanding judicial review.

### Conclusion

In short, the Department has failed to demonstrate the "impossibility" of applying

the piece rate regulations to the task rate system, relying instead on the alleged "difficulty" of implementation and enforcement. The Court is highly dismayed by the Department's apparent willingness to shirk its statutory obligation to protect workers out of nothing more than a concern that implementation of these regulations in the sugar cane industry might pose some additional obstacles not present in sectors of the economy paying by "simpler" piece rates.

■ Neither the plain language nor the purpose of the regulations support DOL's conclusion that the task rate system is not a "piece rate"—and the agency's current interpretation of the regulations is inconsistent with its previous position on this issue. As such, in the absence of a reasoned explanation for its conclusion, the Court must reject DOL's contention that the task rate system is not subject to the Department's piece rate regulations.[7]

The Court shall now turn to a consideration of the second challenge raised by the Plaintiffs to the conclusions set forth in the Final Report: DOL's rejection of the proposition that there was an 8–ton/day minimum productivity standard in the sugar cane industry.

II. *The Department of Labor has a long history of recognizing an 8 ton/day minimum productivity standard in the sugar cane industry; and the Court therefore finds that DOL's recent rejection of this proposition in its Final Report is arbitrary and capricious and cannot be upheld as a matter of law.*

In compiling the Final Report, the Department was also directed to address the question of whether the Sugarcane Growers violated this Court's injunction in *NAACP II.* In order to consider this issue, the Department was required to determine the minimum productivity standard in the sugar cane industry—because DOL's piece rate regulations mandate that minimum productivity requirements be held constant at 1977 levels.

In issuing the Final Report, the Department rejected the proposition that the minimum productivity standard in the sugar cane industry was 8 tons/day or 1 ton/hour. The Plaintiffs have challenged this conclusion as arbitrary and capricious, and the Court must agree that the Department's determination as to this issue cannot be upheld for the reasons set forth below.

A. **First, there is ample support for the Plaintiffs' contention that the plain language of the Clearance Order established a productivity standard of 8 tons per day.**

■ The Court first finds that the plain language of the Clearance Order does indeed support the Plaintiffs' contention that the productivity standard in the sugar cane industry was 8 tons per day. Specifically, the language in the Clearance Order stated that "a worker would be expected to cut an average of eight tons of harvest cane per day throughout the season." Further requiring that workers meet minimum productivity standards, the Clearance Order advised employees that they would be subject to "check-out"[8] provisions for failure to keep pace. ("Upon failure to meet the minimum required production standard on the third trial

---

7. It is important to emphasize that the Court's decision in this respect is limited. DOL's contention that the task rate system is not a regulable piece rate cannot withstand judicial scrutiny, even under the highly deferential arbitrary and capricious standard of review. However, the Court's determination that DOL erred in concluding that the "task rate" is not a "piece rate" does not extend to a determination as to what the regulable piece rate in the industry actually is. The Court is reluctant to substitute its judgment for that of agency on the basis of the record currently before it, so the Court shall thus limit its holding to a finding that the Department

erred in concluding that the task rate was not a piece rate, and shall refrain from making an affirmative determination as to the applicable piece rate at this point in time.

8. The "check out" system was allegedly employed by the sugar cane Growers as a disciplinary measure to ensure that workers were meeting minimum productivity requirements. Those who failed to meet the requisite standards were apparently subject to warnings and ultimately discharge. As discussed below, however, there is a dispute among the parties as to how this sys-

day, the worker may be terminated.") *See* Plaintiffs' Motion at 30–31.

As the only objective measure of productivity stated in the Clearance Order, there is substantial merit to the Plaintiffs' claim that the 8 ton requirement was both a material term and condition of work and the productivity standard then in effect. Indeed, as the Plaintiffs have pointed out, this was also the conclusion reached by Judge Lucy Brown in Florida in a lawsuit directly challenging the payment practices and contractual obligations of the Florida sugar cane growers. *See Bygrave, et al. v. Sugar Cane Growers Cooperative, et al.*, No. CL–89–8690–AI (15th Cir.Ct., Palm Beach Co., Fla.)[9] The Court can thus not accept the Department's rejection of this proposition as it fails to adequately address the agency's reasons for disregarding what the Court deems an entirely reasonable interpretation of this section of the Clearance Order.

**B. The Court is also reluctant to defer to the agency's recent conclusion that the 8 ton language did not constitute a productivity standard in view of the Department's own prior determination to the contrary in another matter.**

The record further reveals that a few years ago USSC attempted to delete the 8–ton language from its Clearance Order, and the Department of Labor rejected this change. Upon appeal by USSC, an ALJ conducted a three-day trial which culminated in a determination "that the 8–ton per day language is a productivity standard and thus, is a material term and condition of employment which must be included in the job offer." *See In the Matter of United States Sugar Corp. v. United States Dept. of Labor,* 91–TLC–0007–008 (ALJ Sept. 8, 1991) (*"USSC I"*) *appeal dism'd as moot sub nom. USSC v. Reich,* C.A. 92–213–CIV–DAVIS (S.D.Fla. September 29, 1993) (*"USSC II"*), *appeal pending,* No. 93–5181 (11th Cir.).[10] The Plaintiffs therefore contend that the Department should be precluded from re-litigating this issue in view of its own prior determination of this matter through the ALJ.

In seeking to rebut this argument, the Defendants attempt, *inter alia,* to mischaracterize the Plaintiffs' position by urging the Court to recognize that the Department is not "forever committed to living with" the ALJ's decision. *See* Defendants' Opposition at 24, n. 16. The Plaintiffs, however, have not argued that the Department may not *prospectively* change its views on this or any other issue; rather, the Plaintiffs have challenged the Department's present attempt to *"retroactively* alter a past adjudication." *See* Plaintiffs' Motion at 33.

Upon consideration of this issue, the Court finds, at the very least, that the Final Report's conclusion as to this matter is entitled to far less deference than would otherwise be accorded to the agency's determination on an issue of this sort. Indeed, even the Defendants concede that "the differences in the two interpretations might impact on the degree of deference the agency decision is afforded. . . ." *See* Defendants' Opposition at 24. Under these circumstances, the ALJ's decision in *USSC I* certainly raises many questions about the Final Report's deviation from the Secretary's prior determination with regard to this issue.

Moreover, the Court remains unpersuaded by the Department's attempts to explain the reason for rejecting the proposition of an 8

---

tem actually operated and as to whether or not it was truly used as "firing standard."

**9.** Finding that the Clearance Order clearly established an 8–ton/day minimum productivity standard, Judge Brown held that the task rate could not be less than the AEWR per ton. On August 21, 1993, judgment was entered in favor of the *Bygrave* Plaintiffs in the amount of $50 million in back wages for the 1987–88 through 1990–91 harvest seasons. This judgment is now on appeal to the 4th District Court of Appeal of Florida and the money has been placed in escrow. Oral argument before the appellate court was scheduled for June 14, 1994.

**10.** The United States District Court for the Southern District of Florida, Miami Division, (Judge Edward B. Davis) granted the Secretary's Motion to Dismiss upon the joint representation of the parties that the case was moot. However, Judge Davis refused to vacate the decision of the ALJ. This matter is now on appeal to the 11th Circuit, and the Court is advised that briefing was scheduled to be completed by June 17, 1994.

ton productivity requirement in issuing the Final Report. The Secretary's previous position was reached after a three day evidentiary trial before an ALJ who had ample opportunity to evaluate the credibility and demeanor of all witnesses who testified as to this issue. In addition, even the Draft Report issued by the Department in 1987 concluded that the 8 ton language constituted a productivity standard. DOL's recent change of heart on this issue has not been adequately explained, and the Court can thus not accept the Final Report's conclusion with respect to this matter.

**C. The Court further finds that the Department's rejection of the 8 ton productivity standard is also inconsistent with DOL's prior representations to this Court.**

█ Perhaps even more importantly, the Court is greatly troubled by the Department's instant conclusion to the extent that it contravenes DOL's prior representations to this very Court. As the Plaintiffs point out, in 1984 the Department submitted a sworn affidavit to the Court signed by United States Employment Service Director Richard Gilliland, which specifically stated that the productivity standard in the sugar cane industry was 8–tons per day. In an attempt to emphasize the Department's alleged commitment to protecting the workers in this industry, the Department tendered a sworn representation that:

> The contention that the minimum productivity standard for workers engaged in the sugar cane harvest rises when the AEWR increases is not substantiated by the record. For many years, the standard productivity requirement has been one ton of cane per hour or eight tons of cane per eight hour day.

Under these circumstances, the Court can hardly be expected to defer to the Department's recent conclusion that 8 tons per day was *not* the minimum productivity standard in the sugar cane industry. In 1984 the Department assured the Court that this *was* the productivity standard and that it was not being improperly increased. Now, almost a decade later, the Department has urged the

Court to accept its finding that 8 tons per day was *not* a minimum productivity requirement. Absent a better explanation for this inconsistency, the Court cannot, and will not, uphold the agency's findings on this issue as set forth in the Final Report.

**D. The Court must reject the Final Report's determination that there was no 8–ton/day productivity standard in the sugar cane industry because DOL has failed to provide a reasoned explanation for disregarding its prior inconsistent statements and because the agency's stated reasons for rejecting this proposition cannot withstand judicial review under the circumstances presented by this case.**

█ Lastly, the Court finds that the Department has utterly failed to provide any reasoned explanation for this change in policy. Thus, even if the Court were willing to ignore all of the Department's prior pronouncements on this issue, the Final Report's conclusion that 8 tons per day was not a minimum productivity standard would still have to be rejected under the arbitrary and capricious standard of review.

As the Plaintiffs point out, DOL's attempt to explain away all of their prior statements on this issue are far from persuasive. At best, they demonstrate that the Department has been careless in its use of the term "productivity standard"—and the Court is of the firm belief that the workers should not be forced to suffer for the Department's carelessness in this regard.

In addressing this issue, the Department acknowledges the existence of these prior representations but remains seemingly unconcerned about the effect of these contradictory assertions on the growers and workers for whose benefit DOL is entrusted with these regulatory responsibilities. In the Final Report, the Department appears to dismiss this problem with what the Plaintiffs have aptly termed the "cavalier" assertion that:

> we fully recognize that, in a number of contexts, the 8–ton language has been characterized as a "productivity standard."

We are confident, however, that, at least as to DOL, this was never meant to imply that the Department viewed the provision as creating a minimum standard for job retention.

*See* Final Report at 31.

It is extremely troubling to the Court that the Defendants would seek to dismiss prior contradictory statements with the sole assurance that DOL's own "intentions" may not have been inconsistent. Even if this were true, the Department can not—and should not—expect the Court to disregard the impact such statements may have had on all members of the industry. DOL's apparent lack of concern for the consequences of the agency's prior pronouncements is unacceptable and cannot provide a reasoned basis for upholding the Department's recent determination that there was no 8–ton productivity standard in the sugar cane industry.

The Department's stated reasons for reaching this conclusion are equally unpersuasive. In particular, the Court is disturbed by the Department's new-found reliance upon the testimony of Ralph Alewine, the Certifying Officer in the Department's Atlanta Regional Office "who was responsible for inclusion of the language in the job orders." *See* Final Report at 30. Mr. Alewine stated that the language was "not intended to be a minimum productivity standard or a material term or condition of worker employment." Rather he claims that he

insisted that [the 8 ton language] be included to give the prospective domestic worker who had never cut cane before, some gross conception of the scope of the work involved so that he would know that it was a difficult job.

*Id.* at 30.

The Court finds the Plaintiffs' skepticism regarding Mr. Alewine's affidavit entirely appropriate under the circumstances of this case. In attempting to discredit Mr. Alewine's testimony, the Plaintiffs argue that his credibility is questionable at best:

That affidavit was prepared for Alewine in 1990 by counsel for USSC and SCGC in the *Bygrave* lawsuit. At the time Alewine gave the affidavit, he had retired from the

Department of Labor and had done consulting work for the Florida Fruit and Vegetable Association. This is the same Ralph Alewine who the House Ed. and Labor Committee criticized for failing "to interest himself in the personnel policies of the growers concerning their recruitment, training, productivity, firing and re-employment policies and practices." It is not at all clear why the opinions of this lower level former bureaucrat, given years after the fact, under circumstances of obvious bias should carry more weight than the sworn statements of DOL's top officials made to this Court in 1984 or any of the other more contemporaneous statements of DOL ...

*See* Plaintiffs' Motion at 38. Without suggesting that there is no merit to Mr. Alewine's declaration, the Court merely finds that DOL's primary reliance upon his statement is problematic, particularly in view of the Defendants' failure to address the circumstances surrounding his testimony or his involvement with this issue.

More importantly, the content of Mr. Alewine's affidavit raises substantial questions which the Final Report has also failed to address. As the Plaintiffs point out, Mr. Alewine's explanation for his inclusion of the 8–ton language makes little sense unless 8–tons per day was in fact the relevant productivity standard. To the extent that the language was included to advise workers of the difficulty of the job, it would have been pointless to understate the minimum productivity requirement then in effect.

### Conclusion

For all of the foregoing reasons, the Court has determined that DOL's rejection of the proposition that there was an 8–ton per day minimum productivity standard in the sugar cane industry cannot be upheld. DOL's determination is inconsistent with the plain language of the Clearance Order and with the holding of the *Bygrave* Court. Moreover, DOL's instant contention is at odds with the Department's prior determination as to this issue in USSC I—and with DOL's sworn representations to this Court during a previous litigation. Lastly, the Court can ascertain no reasoned basis for the Department's

conclusion and must thus find that DOL has erred by failing to consider all relevant factors, particularly the impact of the 8-ton language on all members of the industry who likely operated under the assumption that this was in fact the minimum productivity standard in the sugar cane industry.

Having determined that the Department erred in concluding that the task rate was not a regulable piece rate, and in finding that there was no 8-ton/day minimum productivity standard in the sugar cane industry, the Court must now turn to the Plaintiffs' third challenge to the Final Report: the Department's determination that there were no violations of either DOL regulations or this Court's prior Orders.

**III.** *Under the circumstances of this case, the Court cannot simply defer to the Final Report's determination that there were no violations of DOL's regulations because the Department's conclusion does not reflect an appropriate consideration of all relevant factors.*

The third issue addressed by the Final Report was the question of whether or not there were actual violations of the Department's regulations during any of the relevant seasons. DOL's conclusions as set forth therein expressed the view that there were no such violations. The Court, however, cannot simply defer to the agency's determination with respect to this issue for the reasons discussed below.

**A.** **The Department's determination that the task rate system should not be subject to the piece rate regulations out of concern for perceived problems with implementation casts at least some doubt on the agency's actual commitment to dealing with problems presented by the need to investigate potential regulatory violations.**

First, the Court is hesitant to credit the Department's factual analysis on the issue of potential violations in view of the agency's obvious resistance to even applying the regulations to the sugar cane industry. This is especially true in view of the fact that the Department's primary reason for con-

cluding that the task rate system was not a piece rate seemed to rest on the perceived difficulties of implementation and enforcement. As such, the Court cannot help but question the Department's dedication to investigating alleged violations of these regulations.

DOL's willingness to exempt this industry altogether on the basis of potential regulatory difficulties raises significant questions as to the extent to which the Department actually extended itself in seeking to find solutions to problems that may have arisen during the course of the investigation. In other words, the Department's own explanations in issuing the Final Report raise at least some questions as to DOL's commitment to tackling the challenges of regulating in a somewhat messy context—which the sugar cane task rate system most definitely presents.

**B.** **Since the Court could not accept the Department's rejection of the 8-ton minimum productivity requirement, DOL's conclusion that there were no regulatory violations cannot be sustained to the extent that it is predicated upon the 8-ton productivity requirement analysis.**

Similarly, the Department's unsatisfactory explanation for rejecting the proposition that there was an 8-ton productivity requirement raises similar concerns about DOL's conclusion that there were no regulatory violations. More specifically, because the Court cannot accept the Department's determination regarding the significance of the 8-ton language, all other conclusions in the Final Report derived from that analysis cannot therefore be upheld. Thus, to the extent that the Department's finding of no violations was predicated upon rejection of the 8-ton productivity standard, this determination too cannot withstand judicial review.

**C.** **The Court finds that the Department's determination that there were no regulatory violations is not based upon consideration of all relevant factors and can therefore not be upheld.**

Moreover, even setting aside the concerns raised by the Court's rejection of

the other conclusions contained within the Final Report, the Department's determination that there were no regulatory violations is hardly unassailable. For example, the Plaintiffs claim that the statistics relied upon by the Department are "useless" and that the actual hours put in by the workers were grossly underreported by the Growers. Additionally, the Plaintiffs assert that DOL inexplicably ignored all testimony submitted by the managers who were likely to have had greater experience with actual payment practices in the industry.

Notably, DOL acknowledges many of these weaknesses and supplies largely unsatisfactory justifications for such problems. With regard to the alleged deficiencies in the data, the Defendants have indicated that "the Department does not disagree with the plaintiffs that the data which was presented may not have been the best for its analysis." *See* Defendants' Opposition at 16, n. 7. As for the claim that the Growers underreported hours, the Department acknowledges that "the Wage and Hour Division did find some underreporting of hours with some sugar cane companies," but DOL goes on to dismiss such problems as being "of no great import." *Id.* at 17. Again, the Court is troubled by what it perceives as the Department's consistent practice of resolving all discrepancies against the workers—often with no sound basis in reason or evidentiary support.

Most significantly, the Department expressly concedes that the data upon which it concluded that there had been no regulatory violations was imprecise and not directly responsive to the issue at hand. Referring to evidence indicating that average worker productivity remained relatively stable over a long period of time, the Department acknowledged that "this data admittedly does not precisely satisfy this Court's *NAACP II* formula ..." *See* Defendants' Opposition at 19. The Department's willingness to rely on such data as an indicator that improper increases in productivity were "unlikely to have occurred" is an insufficient basis upon which to ask the Court to defer to the agency's conclusions in this respect.

Moreover, the Department's reasoning on this issue is far too insensitive to the intended purposes of the regulations for the Court to accept the conclusions set forth in the Final Report. As demonstrated above, one of the primary purposes of the regulations in question was to ensure that *minimum* productivity requirements for the most vulnerable workers were not improperly increased. The fact that *average* productivity remained relatively stable says nothing about the experiences of those working on the margin—for whose protection the regulations were specifically developed.

The Court is thus not at all reassured by the Final Report's apparent reliance upon what it deems "common sense" in analyzing this issue. Noting that "actual productivity has remained essentially stable throughout the period in question," the Final Report states that:

> The empirical evidence is consistent with common sense. Absent changes in technology, in low-skill occupations, productivity should be relative stable under the same wage system.

*See* Final Report at 28, n. 16. In many ways, reliance upon this notion flies in the face of the regulations' intended purpose: to protect against unlawful increases in productivity that can and do occur when workers are vulnerable to exploitation at the hands of domestic employers.

Indeed, under the "check-out" system, it would be entirely possible for productivity to remain at unlawfully high levels—or to increase in violation of the regulations—if more highly skilled foreign workers were recruited and retained at the expense of slower, less-experienced domestic employees. Thus, to the extent that the regulations are intended to combat "adverse effect," the Department's willingness to rely upon consistency in *average* productivity may mask real problems for the most vulnerable segments of the farm worker population.

### Conclusion

As such, the Court cannot accept the Department's conclusion that no violations of the regulations occurred. The Department's entire analysis is predicated upon an erroneous interpretation of the piece rate regulations and upon the unsupported proposition

that there was no 8–ton/day minimum productivity requirement in the sugar cane industry. Moreover, the Department itself implicitly concedes that there were serious flaws in its analysis of potential violations, but asks the Court to ignore these problems by adopting the laissez-faire attitude that violations were "unlikely" to have occurred. This willingness to gloss over real analytical difficulties cannot be sanctioned as adequate consideration of all relevant factors—and the Court finds that the Department's determination that there were no violations cannot be upheld as "rational decision-making" in view of DOL's own admissions as to the fundamental flaws in its review.

Once again, however, the Court's determination that the conclusions in the Final Report cannot be sustained is limited in scope. In finding that the Department erred in prematurely concluding that there were no regulatory violations, the Court has been careful not to improperly substitute its own judgment as to this issue for that of the Department. Consequently, the Court's holding in this respect leaves unanswered, for the moment at least, the question of whether there were actually any regulatory violations.

In short, the Court's instant ruling is directed solely to the sufficiency of the Final Report. In concluding that many of the determinations contained therein cannot be upheld as a matter of law, the Court is left with a number of unanswered questions—as explained more fully below.

**IV.** ***In view of the Court's conclusion that the Final Report cannot be upheld as a matter of law, further proceedings will be required because the Court cannot determine, on the basis of the record currently before it, whether or not the Department's regulations were in fact violated.***

 As the preceding discussion makes clear, the Court cannot accept the Department's conclusions as set forth in the Final Report. This determination, however, does not end the inquiry because it still leaves unanswered many of the questions the Department was directed to investigate in compiling the Final Report. For this reason, the Court believes that further proceedings will be necessary to resolve the remaining issues presented by this case. The following discussion briefly outlines some of the questions yet to be resolved.

**A. Although the Court has rejected the Department's contention that the task rate system is not properly subject to the piece rate regulations, the nature of the appropriate sugar cane piece rate remains the subject of some dispute.**

As demonstrated in Section I, *supra,* the Court must reject the Department's determination that the piece rate regulations are inapplicable to the task rate system of payment utilized in the sugar cane industry. The Department's interpretation set forth in the Final Report is contrary to both the plain language and purpose of the regulations and is inconsistent with the agency's prior positions on this issue. More importantly, the Court cannot accept the Department's concerns about the alleged difficulty of applying the regulations to complex payment systems as a reasoned basis for exempting this industry from these important regulatory protections.

The Court's finding that the Department erred in concluding that the task rate is not a piece rate, however, does not answer the question of what does constitute the regulable piece rate in this industry. The parties are in substantial disagreement as to this issue, and the Court finds that the record currently before it is insufficient to make this determination as it presents a factual matter which is the subject of intense dispute between the parties and which is material to the ultimate outcome of this case. As such, in view of the Department's apparent resistance to proper consideration of this issue, the Court finds that further proceedings will be required to make this determination.

The primary dispute rendering summary judgment on this issue inappropriate at this time centers around the Plaintiffs' contention that the "budgeted rate per ton" was utilized by the Growers as a piece rate and is thus properly subject to the adjustment provisions of DOL's regulations. The Plaintiffs ac-

knowledge the existence of daily changes in the task rates, but contend that these variations primarily reflect efforts to keep the sugar companies "within budget" with regard to projected labor costs.

Significantly, the Department concedes that "there was some testimony to this effect," but ultimately concludes that "this theory was not supported by the data in the record." *See* Defendants' Opposition at 11–12. Although there may be some merit to this position, the Court is unwilling to accept this proposition at this time in view of the substantial evidence that the Department's determination was at least heavily influenced by an improper concern with the difficulty of applying the regulations to the task rate system. Under these circumstances, the Court is reluctant to defer to the agency's conclusions in this respect as it appears that the Department was improperly motivated more by a desire to ensure easy application than by a commitment to properly enforcing DOL's own regulations.

The Department, of course, contends that resolution of this issue is properly left to the discretion of the agency—and the Court both hopes and expects that DOL will employ its expertise in resolving this issue. However, it is imperative that the Defendants begin to direct their time and energy to the task of finding solutions to potential problems with application of the regulations—rather than concentrating primarily upon developing excuses and justifications for exempting the sugar cane industry from these regulatory requirements.

In reaching this conclusion, the Court does not in any way mean to minimize the difficulty of applying the regulations to this industry; but DOL has so far failed to explain its reasons for rejecting many potential approaches to regulation of the sugar cane task rates. The Court shall thus direct the Defendants to reconsider this issue in an attempt to determine a regulable piece rate in the sugar cane industry—and counsel for all parties may address the question of whether the "budgeted rate per ton" (or perhaps Dr. Emerson's "row with given conditions") was in fact the applicable piece rate during the relevant harvest seasons.

**B. The Department's rejection of the 8–ton minimum productivity standard is not properly substantiated by the record and can thus not form the basis for any analysis of potential violations.**

As demonstrated in Section II, the Court cannot accept the Final Report's rejection of the proposition that there was an 8–ton minimum productivity standard in the sugar cane industry as it is contradicted by the plain language of the Clearance Order and by numerous prior representations made by the Department itself. Most problematically, the Department's conclusion in this regard is seemingly indifferent to the effect of such prior pronouncements on all members of the industry, and the Court cannot sanction such a serious breach of the Department's obligations to those it regulates. The Court's rejection of this section of the Final Report, however, still leaves unanswered a few questions related to this issue.

First, although the Court believes there is ample support for the proposition that the 8–ton language did indeed constitute a minimum productivity standard, the Court might still be willing to entertain further argument on this point from the Department—provided sufficient attention is directed to the question of what impact these prior pronouncements may have had on the growers and workers who were undoubtedly significantly affected by this allegedly "careless" use of language.

More significantly, even if the Court were to conclude that there was an 8–ton per day productivity standard in effect, the parties still dispute how many hours constituted an actual day: the Plaintiffs contend that it was eight whereas the Growers allege that it was only six. As noted above, the Plaintiffs have also challenged the Department's reliance upon the Growers' representations as to hours, despite evidence of underreporting. The Final Report merely glosses over this problem, and the Court believes that these allegations cannot be dismissed without further inquiry.

For all of these reasons, it is clear that at least some factual disputes remain as to

question of whether there was an 8–ton minimum productivity standard in the sugar cane industry. As such, and in view of the need for further proceedings with regard to the other issues in this case, the Court shall entertain limited additional argument on this issue as well.

C. **The Court further finds that there are genuine issues of material fact still in dispute with regard to the question of whether there were any actual violations of DOL's regulations, thereby necessitating further examination of these issues.**

■ In their respective Motions for Summary Judgment, both the Defendants and the Intervenor–Defendants urge the Court to find that, even assuming the Plaintiffs are correct in their interpretation of the regulations, the "bottom line" is that there is no evidence of actual violations and the Plaintiffs are thus not entitled to judgment in their favor. The Plaintiffs, of course, strongly dispute this notion, and argue that the Final Report has ignored or misinterpreted substantial evidence of regulatory violations. As explained in Section III, the Court cannot accept the Final Report's determination as to this issue as the Plaintiffs are correct in asserting that the Department has not properly considered all relevant factors. However, the question of whether the regulations were actually violated remains squarely in dispute.

A number of important factual issues remain to be resolved in order to properly address this matter of potential violations. A brief review of the parties' respective positions on this issue should help sketch the contours of the factual inquiries that will need to be made.

The Plaintiffs contend that under the task rate system, sugar cane workers were paid on the basis of the "budgeted rate per ton"— which should properly have been subject to regulation as a piece rate. They argue that feet per row are easily convertible into tonnage and that variations in the price paid per row were essentially temporal adjustments to help the Growers stay "within budget" during each season. The Plaintiffs further con-

tend that there was a minimum productivity standard of one ton per hour—enforced under the "check out" system—and that the workers were thus entitled to be paid the "AEWR per ton" in order to ensure compliance with the Department's piece rate regulations. Finally, the Plaintiffs argue that since actual productivity was far in excess of one ton per hour, there were substantial violations of the regulations, thereby entitling them to declaratory and injunctive relief from the Department and to monetary restitution from the Growers.

In response, the Department maintains that these arguments were fully considered and ultimately rejected during the process of compiling the Final Report. DOL argues that there was no "disguised" piece rate in the form of the "budgeted rate per ton" and that variations in price reflected real differences in cutting conditions rather than mere attempts to keep the Growers on target with regard to the budgeted rate per ton. DOL has further argued that one ton per hour was not a minimum productivity standard and that there is no evidence that it was used as such under the "check out" system.

Notably, DOL does acknowledge that the workers may have a *contractual* claim against the Growers as a result of the 8–ton language, but contends that no *regulatory* violations have been documented because the regulations require *increases* in productivity in response to changes in the AEWR. Arguing that the record suggests that actual productivity has been fairly stable throughout the period in question, the Department asserts that no regulatory violations have been demonstrated. Moreover, the Department also urges the Court to find that the relevant benchmark established by this Court's Order was the productivity requirement in effect in 1977—not language inserted into the Clearance Order several years later. As no documentation as to productivity in 1977 has been provided, the Department contends that the Plaintiffs have not demonstrated any violations of the piece rate regulations.

Finally, although the Growers agree in large part with the Department's arguments, they contend that these claims are mostly irrelevant because the "bottom line" is that

no actual violations of the regulations occurred. The Growers dispute the notion that they paid a disguised piece rate in the form of the "budgeted rate per ton" and insist that tonnage was not measured in the field and was thus not attributable to individual workers.

The Growers further contend, however, that, even if the "budgeted rate per ton" had been the applicable piece rate, there were no regulatory violations because the workers were paid lawful wages in all relevant seasons—most of which were approximately 20% above those required by the AEWR. The Intervenor–Defendants thus contend that there could not have been any statutorily proscribed "adverse effect."

With regard to minimum productivity, the Growers also reject the notion that there was a minimum productivity standard of one ton per hour. They claim first that "8 tons/day" usually entailed only a six hour day, and second, that there is no evidence that any worker was ever discharged under the "check out" system for failing to cut 8 tons/day. Moreover, since workers were required to cut an *average* of 8 tons/day, the Growers contend that the "check out" system was not—and could not have been—used as a firing standard. Lastly, the Growers argue that there were no unlawful increases in minimum job-retention productivity levels— both because there is no evidence of what this level was in 1977 (and thus no benchmark to measure it against) and because there is substantial evidence that average productivity has remained fairly stable, thereby making increases in minimum productivity highly unlikely to have occurred.

It is thus clear that there are a number of important factual determinations that must be made in order to resolve the dispute over whether the regulations were violated. The most significant questions are likely to include the following:

(1) Whether the "budgeted rate per ton" was the regulable piece rate;

(2) Whether DOL and the Growers complied with the requirement that the applicable piece rate be increased in response to increases in the AEWR;

(3) Whether the 8–ton/day language was the minimum productivity standard in the sugar cane industry (and how many hours constituted a typical day);

(4) The nature of the "check out" system and the facts surrounding its use in this industry during the relevant seasons; and

(5) Whether minimum productivity requirements were improperly increased in violation of the Department's regulations and this Court's prior Orders.[11]

The foregoing list is by no means exhaustive—but after the extensive proceedings before DOL, the Court is sure that the parties are all intimately familiar with the many factual issues that remain in dispute, so that this brief sketch of disputed issues should suffice.

It is, of course, extremely unfortunate that the Court must now enter into this debate at all. The Department was directed to investigate all of these issues more than seven years ago, and it is disheartening that many of the same questions remain unanswered today. Under the circumstances, however, it appears that DOL has been remiss in fulfill-

11. This determination will undoubtedly implicate discussion of the relevant benchmark in assessing violations. The Department contends that violations should be measured against 1977 levels by virtue of this Court's prior rulings, and that the Plaintiffs' failure to produce evidence of productivity requirements in that year precludes any finding of violation. The Court, however, is not satisfied with this response for two reasons. First, the Department bears primary responsibility for ensuring that its regulations are properly enforced, and this Court's Order directed *DOL* to investigate this issue. It is thus unacceptable for the Department to sit back and say "well, if the Plaintiffs couldn't find the necessary data, they can't claim the regulations were violated." This laissez-faire attitude toward DOL's own obligations and responsibilities is highly troubling to the Court. Moreover, the Court will not accept any such determination from the Department absent a comprehensive consideration of the effect of the 8–ton language in the Clearance Order on this issue. The Plaintiffs have suggested that the Department's usual practice is to measure violations against the terms *offered* in the Clearance Order. As such, DOL must respond to the contention that regulatory compliance is usually measured against the *offered* rate (in this case 8 tons/day) rather than the *actual* rate (whatever the productivity standard was in 1977—a matter which itself remains in dispute).

ing its statutory and regulatory obligations, and the Court must thus reject the conclusions set forth in the Final Report. In doing so, the Court is again faced with many of the same questions that necessitated production of the Final Report in the first place. Fortunately, however, most of the relevant data has already been compiled and a much fuller factual record now exists upon which to make the necessary determinations to conclude this litigation in a just and expeditious manner.

### Procedures for Resolution of Remaining Issues

In view of the Court's rejection of the conclusions contained within the Final Report and the determination that certain issues of material fact remain in dispute, the Court is prepared to conduct an evidentiary hearing for the purpose of taking testimony on all such remaining issues pursuant to Federal Rule of Civil Procedure 43(e).[12] Toward this end, the Court shall direct counsel for all parties to meet and confer and then advise the Court as to the names and addresses of any witnesses whose testimony shall be presented.

In providing for an evidentiary hearing, the Court is forced to avail itself of a "last resort" in seeking to resolve this case. As discussed above, the Department's efforts to properly address these issues in the Final Report have failed, and the Court sees little likelihood that remanding this matter to the Department would efficiently further the expeditious resolution of this case. This is, of course, extremely unfortunate as the Department is unquestionably in a far better position than the Court to make these factual determinations.

However, although the history of this case leaves little reason for optimism, the Court continues to hope that the Department will make every effort to utilize its expertise in this matter in order to assist the Court and the parties in properly resolving the issues presented by this case. As such, to the extent that the Department is interested in seeking an opportunity to reconsider any of the conclusions reached in the Final Report in light of this Opinion, and prior to any further proceedings in this matter, the Court will entertain any Motions to that effect. Needless to say, the Court will, of course, also welcome any other suggestions from counsel for all parties as to how best to facilitate the just and speedy resolution of this case.

Finally, the Court should also take this opportunity to ensure that counsel are fully prepared to address all remaining issues in this case at the Hearing. Thus, in addition to considering the issues set forth above regarding potential violations under both the H–2 and the H–2A programs,[13] the Court shall also expect counsel to be prepared to offer testimony as to these issues with regard to the claims of the seed cane workers.[14]

During the Hearing, the Court shall also entertain any further arguments that the parties may wish to present concerning the issue of remedies. In their instant submissions, the Growers expressly reserved the right to "fully contest the legal and factual

---

12. The Court notes that counsel for the parties were instructed to consider this possibility prior to the March 23, 1994 Hearing as well. At that time, however, only the Plaintiffs indicated any interest in calling witnesses to testify before the Court. The Department, and presumably the Growers, maintained that the Court's review was limited in scope to ascertaining whether the Final Report was properly supported by the record and thus opposed the taking of any testimony. Accordingly, the Court did not take testimony and confined its review solely to the propriety of the Final Report. At this point in the case, however, since the Court has determined that the Final Report cannot be sustained, the advisability of conducting an evidentiary hearing must be reconsidered.

13. The relevant harvest season under the H–2 regulations is 1986–87, and subsequent seasons are at issue with respect to the H–2A regulations.

14. Counsel have represented to the Court that the issues presented by the experience of the seed cane workers are essentially the same as those raised in connection with harvest cane. The record reveals that the principal difference between harvest and seed cane concerns the actual cutting process. With harvest cane, a burning process is utilized to get rid of the leaves and the trash in the field, thereby rendering the cutting process slightly easier. Seed cane, it appears, is cut green, usually earlier in the season. As such, the workers have to contend with more growth during hotter weather, making the job both more difficult and more time consuming.

basis for the remedy sought by plaintiffs...." As such, and in view of the Court's determination that further proceedings will be required in this matter, counsel shall therefore be afforded this opportunity to present such further arguments or evidence as to remedies as they may wish. Lastly, the Court shall also address the proper disposition of the Interim Stipulated Protective Order now in effect.

Accordingly, in order to facilitate adequate preparation for the Hearing, counsel shall be directed to meet and confer in order to establish an orderly framework for the presentation of all necessary issues. Upon doing so, counsel shall submit a joint pleading to the Court setting forth their recommendations in this regard and advising the Court as to how much time they anticipate the presentation of each issue will require. As indicated above, any further suggestions counsel wish to propose will of course be carefully considered by the Court.

## CONCLUSION

For all of the foregoing reasons, the Court must find that the Department of Labor's Final Report cannot be upheld, even under the highly deferential standard of review required of the Court. DOL's determination that the task rate system is not subject to its piece rate regulations is inconsistent with the plain language and purpose of the regulations and represents an unexplained change in position for which the Department has not offered a reasoned explanation based upon a consideration of all relevant factors. Similarly, the Department's determination that there was no 8–ton/day minimum productivity standard in the sugar cane industry is inconsistent with DOL's own prior statements regarding this issue on more than one occasion; and the Department has provided no rational basis for its sudden rejection of this proposition. Finally, DOL's determination that there were no violations of either this Court's Orders or the Department's regulations cannot withstand judicial review because it is not based upon a consideration of all relevant factors.

However, in concluding that the Department's Final Report cannot withstand judicial review, the Court has been careful not to improperly substitute its judgment for that of the agency. As such, the Court has limited its holding to a determination that the conclusions set forth in the Final Report are arbitrary and capricious and cannot be sustained as a matter of law.

Unfortunately, the Court's determination that the Final Report must be rejected leaves unanswered many of the questions that the Department was directed to investigate in 1986. Accordingly, further proceedings will be required to resolve the remaining issues presented by this dispute. In view of the Department's failure to analyze these issues in accordance with law, the Court must now conduct an evidentiary hearing and trial in order to resolve all remaining disputes. The Court shall thus issue an Order of even date herewith consistent with the foregoing Memorandum Opinion so that this litigation can be fully and fairly resolved in a just and efficient manner.

## ORDER

Upon careful consideration of all of the pleadings submitted in connection with the parties' respective Motions for Summary Judgment, the oral arguments of counsel at the March 23, 1994 Hearing, the applicable law, the entire record herein, and for all of the reasons set forth in this Court's Memorandum Opinion issued of even date herewith, the Court has determined that the conclusions set forth in the Department of Labor's Final Report cannot withstand judicial review. Accordingly, it is, by the Court, this 22nd day of September, 1994,

ORDERED that the Plaintiffs' Motion for Summary Judgment shall be, and hereby is, GRANTED, but only to the extent that the Court finds that the Department of Labor's Final Report cannot be upheld; and it is

FURTHER ORDERED that further proceedings shall be conducted to resolve the remaining issues presented by this dispute in accordance with this Court's Memorandum Opinion issued of even date herewith; and it is

FURTHER ORDERED that counsel for all three parties shall be, and hereby are,

directed to meet and confer in order to discuss a framework for the just and orderly resolution of the remaining issues in this case; and it is

FURTHER ORDERED that counsel shall submit a joint pleading to the Court on or before 4:00 p.m. on October 17, 1994 setting forth their recommendations in this regard, and advising the Court of the names and addresses of any witnesses they intend to call in accordance with the Instructions set forth in the accompanying Memorandum Opinion; and it is

FURTHER ORDERED that all other pending Motions are hereby rendered and declared MOOT in view of the determinations set forth above.